728 F.2d 539
 234 U.S.App.D.C. 258, 4 Soc.Sec.Rep.Ser. 187,
Medicare&Medicaid Gu 33,646
 VILLA VIEW COMMUNITY HOSPITAL, INC., a nonprofit corporation, Appellant
v.
Margaret M. HECKLER, Secretary of Health and Human Services.
LOS ALAMITOS GENERAL HOSPITAL, INC., a corporation, dba Los
Alamitos General Hospital
v.
Margaret M. HECKLER, Secretary of Health and Human Services,
Appellant.
 Nos. 83-1310, 83-1456.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 13, 1984.
Decided March 2, 1984.
 
 Patric Hooper, Los Angeles, Cal., for appellant in No. 83-1310.
 Amy Yourman, New York City, a member of the Bar of the New York State Court of Appeals First Division, pro hac vice by special leave of the Court with whom Stanley S. Harris, U.S. Atty., Washington, D.C., (at the time the brief was filed) and Robert P. Jaye, Deputy Asst. Gen. Counsel, Dept. of Justice, Washington, D.C., were on the brief, for appellee in No. 83-1310.
 Jeanne Schulte Scott, Washington, D.C., for appellant. Stanley S. Harris, U.S. Atty., Washington, D.C., (at the time the brief was filed), Royce C. Lamberth, Michael J. Ryan and Valerie K. Schurman, Asst. U.S. Attys., Washington, D.C., also entered appearances, for appellant in No. 83-1456.
 Patric Hooper, Los Angeles, Cal., for appellee in No. 83-1456.
 Before WRIGHT, MIKVA and BORK, Circuit Judges.
 Opinion PER CURIAM.
 
 PER CURIAM:
 
 1
 These cases raise a common issue concerning the appropriate level of Medicare reimbursement that a hospital should receive for costs incurred in specialized units that are more intensive than routine care, but less intensive than a traditional Intensive Care Unit. The two units at issue in these cases treat patients with serious cardiac problems who do not require bedside monitoring. These patients are ambulatory and are monitored with portable software telemetry units. In both cases, the Secretary of Health and Human Services (the Secretary) determined that the units were not "special care inpatient hospital unit[s]" within the meaning of 42 C.F.R. Sec. 405.452(d)(10) (1978).* If the units had been classified as "special care" units, each hospital would have obtained a higher level of Medicare reimbursement. One district judge upheld the Secretary's decision as to Villa View Community Hospital and the hospital appealed. A second district judge reversed the Secretary's determination as to Los Alamitos General Hospital and the Secretary appealed. Although each case involves unique facts, the Secretary's treatment of the two units raise virtually identical issues under the applicable regulation and we decide both cases in this single opinion. Because we find that the Secretary's determinations are supported by substantial evidence, we affirm the district court in Villa View Community Hospital, Inc. v. Schweiker, Civil Action No. 81-1793 (D.D.C. Jan. 16, 1983) (Villa View), and reverse the district court in Los Alamitos General Hospital, Inc. v. Donnelly, 558 F.Supp. 1141 (D.D.C.1983) (Los Alamitos).
 
 THE REGULATORY FRAMEWORK
 
 2
 These cases arise under Part A of the Medicare statute, which authorizes the payment of benefits to institutional providers of health services, including Villa View Community Hospital (Villa View) and Los Alamitos General Hospital (Los Alamitos). Such providers are reimbursed for the reasonable and necessary costs of the services provided to Medicare beneficiaries. See 42 U.S.C. Sec. 1395x(v)(1)(A) (1976); 42 C.F.R. Sec. 405.402 et seq. (1978).
 
 
 3
 The initial calculation and review of reimbursable costs is conducted by fiscal intermediaries (usually major private health insurance companies) who act as agents of the Secretary. See 42 C.F.R. Secs. 405.406(b) and 405.453(f) (1978). A provider may appeal the intermediary's determination to the Provider Reimbursement Review Board (the Board). 42 U.S.C. Sec. 1395oo (1976). Within sixty days of the Board's determination, the Secretary may elect to review that decision on her own motion. (The Secretary has delegated this authority to the Administrator of the Health Care Financing Administration who issued the decisions in these cases.) Judicial review is available after the administrative proceedings have been completed. The statute authorizes a provider to seek judicial review of "any final decision of the Board, or of any reversal, affirmance, or modification by the Secretary ...." 42 U.S.C. Sec. 1395oo (f)(1) (1976).
 
 
 4
 Congress has given the Secretary considerable discretion to promulgate cost-reimbursement regulations that give meaning to the term "reasonable costs." See 42 U.S.C. Sec. 1395x(v)(1)(A) (1976). Under the regulations, an average cost per diem is determined for services provided by the hospital. That figure is multiplied by the number of patient days attributable to Medicare beneficiaries. During the first five years of the Medicare program, the Secretary's regulations recognized only one class of inpatient hospital care for purposes of reimbursement. In 1972, however, the Secretary amended the regulations, on the theory that the purposes of Medicare would be served better if two classes of care were used to calculate reimbursable costs. See Psychiatric Institute of Washington, D.C., Inc. v. Schweiker, 669 F.2d 812, 813 (D.C.Cir.1981).
 
 
 5
 The regulations now distinguish between care provided in "Routine Care" centers and that provided in "Special Care Units." The average costs per diem in each class are calculated separately. Because special care units are much more expensive to run, the average cost per diem in such units is much higher than the average cost per diem in routine care units. The result is that hospitals will receive more money per patient if the cost of services provided that patient are averaged into the special care calculation rather than into the routine care calculation.
 
 
 6
 The legal issue presented by both cases is very narrow and involves the application of the regulation which defines special care units. That subsection provides in full:
 
 
 7
 (10) Intensive care units, coronary care units, and other special care inpatient hospital units. To be considered an intensive care unit, coronary care unit, or other special care inpatient hospital unit, the unit must be in a hospital, must be one in which the care required is extraordinary and on a concentrated and continuous basis and must be physically identifiable as separate from general patient care areas. There shall be specific written policies for each of such designated units which include, but are not limited to burn, coronary care, pulmonary care, trauma, and intensive care units but exclude postoperative recovery rooms, postanesthesia recovery rooms, or maternity labor rooms.
 
 
 8
 42 C.F.R. Sec. 405.452(d)(10) (1978). Because the units in question do not fall under any of the enumerated categories, if they are covered by the regulation at all, they must be classified as "other special care inpatient hospital unit[s]" and must meet the various requirements set forth in the regulation. The only issue on appeal is whether the units in question are ones "in which the care required is extraordinary and on a concentrated and continuous basis." Id. (emphasis added). The Secretary found that all of the other requirements of the regulation had been met in both cases.
 
 
 9
 The application of this regulation and, in particular, interpretation of the terms "extraordinary," "concentrated," and "continuous" has sparked a great deal of litigation. See, e.g., Psychiatric Institute, 669 F.2d 812; Sun Towers, Inc. v. Schweiker, 694 F.2d 1036 (5th Cir.1983); John Muir Memorial Hospital, Inc. v. Schweiker, 664 F.2d 1337 (9th Cir.1981); White Memorial Medical Center v. Schweiker, 640 F.2d 1126 (9th Cir.1981). In deciding whether a unit is a special care unit, the Secretary determines whether the care provided is similar to that provided by the same institution in one of its units that is explicitly enumerated in the regulation. Although providers have challenged that interpretation of the regulation, arguing that the proper comparison is to the routine care provided by the institution, we have upheld the Secretary's interpretation as reasonable. Psychiatric Institute, 669 F.2d at 814. Other courts have also upheld the Secretary's comparison to the highest level of care provided. See e.g., Sun Towers, 694 F.2d 1036; White Memorial, 640 F.2d 1126.
 
 
 10
 The question for the district court and for this court on appeal is whether the Secretary's determinations that the care provided was not "extraordinary and on a concentrated and continuous basis" are supported by substantial evidence. See 42 U.S.C. Sec. 1395oo(f) (judicial review is governed by the standards set forth in section 706 of the Administrative Procedure Act, 5 U.S.C. Sec. 706 (1976)). Although there are some differences between the two units at issue on appeal, they are similar in most respects.
 
 Villa View
 
 11
 The unit at issue in Villa View was a ten-bed Critical Care Telemetry Unit (CCTU) set up to care for patients with suspected or known cardiac conditions. The CCTU was part of Villa View's critical care area. It was located next to the Intensive Care Unit (ICU) and, along with that unit, was isolated from the hospital's general routine areas. The nurses in both units had identical qualifications, training, and skills and were supervised by the same head nurse. Some of the nurses were used interchangeably in the two units. The patients in the CCTU were monitored twenty-four hours a day by telemetry equipment which transmitted the patients' heart rhythms to a central station. Patients in the ICU were monitored by bedside equipment that prevented them from moving about.
 
 
 12
 The intermediary concluded that the CCTU did not qualify for special care status. Villa View appealed that decision to the Board, which reversed. The Secretary subsequently issued a decision reversing the Board and agreeing with the intermediary that the CCTU did not qualify as a special care unit.
 
 
 13
 The Secretary pointed to a number of factors which differentiated the ICU and CCTU at Villa View. Included among them were the following: patients in the CCTU were ambulatory and not confined to bed as were the ICU patients; the number of nursing hours and nursing costs and the nurse-to-patient ratio at the CCTU were considerably lower than those at the ICU; thirty-eight percent of the patients admitted into the CCTU were transferred from the ICU after their conditions improved; and a "significant percentage of the patients discharged from the CCTU" went home rather than into one of the hospital's routine care units. After considering this comparative information, the Secretary concluded that "the CCTU acts as a step-down unit to the recognized special care unit. The CCTU acts as an intermediate unit to the recognized special care areas and the routine areas." The district court upheld the Secretary's determination that Villa View's CCTU did not qualify as a special care unit.
 
 Los Alamitos
 
 14
 The unit at issue in Los Alamitos was a five-bed Post-coronary Care Unit (PCU) similar in most respects to the CCTU found at Villa View. It was located next to the hospital's ICU and was equipped with portable telemetry units to monitor the patients. Both the ICU and the PCU were staffed by highly-trained nurses. The administrative proceedings in Los Alamitos mirrored those that occurred in Villa View, with the Secretary concluding that the PCU was not a special care unit within the meaning of the regulations.
 
 
 15
 In comparing Los Alamitos' PCU to its Intensive Care Unit, the Secretary emphasized the wide disparity in nursing hours and costs in the two units. The daily amount of nursing care provided in the PCU was less than half that provided in the ICU and closely approximated the amount of care provided in routine areas of the hospital. Furthermore, a majority of patients admitted to the PCU were transferred from the ICU. Finally, one of the hospital's expert witnesses stated that the PCU provided a "third level of care," although the witness never elaborated upon what she meant by that statement.
 
 
 16
 The district court reversed the Secretary's determination in Los Alamitos "[n]otwithstanding the fact the nurse/patient ratio may not be as high in the PCU, and the patients treated there may not be as acutely ill as those in the [ICU]."
 
 
 17
 The Secretary's Authority to Determine Special Care Status
 
 
 18
 The Secretary found that Villa View's CCTU and Los Alamitos' PCU were not sufficiently similar to those hospitals' Intensive Care Units to be considered special care units. Those findings are supported by substantial evidence. The evidence shows that many patients were transferred to the PCU and CCTU from the hospitals' Intensive Care Units after their conditions had improved. Moreover the Intensive Care Units in both hospitals had considerably higher staffing levels than the units at issue here. The evidence supports the finding that the disputed units are not "similar" to the Intensive Care Units in terms of the "extraordinary," "concentrated" and "continuous" nature of the care which each provided.
 
 
 19
 The Secretary concedes that the patients treated in the CCTU and PCU were seriously ill and required more intensive care than patients located in the routine care areas of the hospitals. But the Secretary has determined that the appropriate comparison under the regulation is to one of the enumerated special care units, not to routine care units. Although the Secretary's interpretation of the regulation admittedly will result in fewer units being classified as special care units, we have already upheld that interpretation as reasonable. Psychiatric Institute, 669 F.2d at 814.
 
 
 20
 Our review of the Secretary's decisions in these cases is guided in large part by the fact that Congress gave the Secretary considerable discretion to determine reimbursable costs under Part A of the Medicare Program. In exercising that discretion the Secretary has determined that distinguishing between special care and routine care units more fairly allocates the burden of hospital costs between Medicare and non-Medicare patients than the previous system which involved one overall calculation. Our limited role is to ensure that the Secretary's regulations are consistent with the statute, reasonably interpreted and consistently applied. We must also ensure that the findings in particular cases are not arbitrary and capricious and are supported by substantial evidence. We cannot, however, substitute our judgment for that of the Secretary in determining which units, as a policy matter, should be classified as special care units.
 
 
 21
 Although the hospital's claims are couched in the language of the substantial evidence test, to reverse the Secretary's decisions in these cases would require us to displace the Secretary's policy as to when special care status should be permitted. Although the Secretary's interpretation and narrow application of the regulation may discourage the development of more cost-efficient patient care units, that is a policy decision well within the Secretary's statutory authority. We reiterate what we said in Psychiatric Institute, a case in which a geriatric care unit was denied special care status:
 
 
 22
 We are concerned lest the Secretary's policy inhibit innovation in treatment of older people to such an extent that cost-effective treatments for the conditions that afflict them may never be developed and proved. Yet we recognize the fiscal obligations of the Secretary as well, and, as a reviewing court, we leave the fundamental choice as to which course of action will provide the greatest amount of care to Congress and its delegate.
 
 
 23
 669 F.2d at 814.
 
 
 24
 Because the Secretary's determinations in both cases were supported by substantial evidence, we affirm the district court in Villa View and reverse the district court in Los Alamitos.
 
 
 25
 It is so ordered.
 
 
 
 *
 The regulations were amended in 1980. Because the hospitals seek reimbursement for costs incurred prior to 1980, we are reviewing the application of the regulations in effect at that time